GENERAL ACCIDENT FIRE AND LIFE ASSURANCE CORPORATION v. FRITO-LAY COMPANY AND ANOTHER. ST. PAUL FIRE AND MARINE INSURANCE COMPANY v. SAME.

243 N. W. 2d 726.

June 11, 1976—No. 45776.

*Ross Muir* and *Jerome W. Perry,* for appellants.
*Wm. J. Nierengarten,* for respondent Frito-Lay.
*Dennis Peterson,* for respondents Halling.

Heard before Sheran, C. J., and Peterson and Yetka, JJ., and considered and decided by the court en banc.

YETKA, JUSTICE.

Appeal from the judgment of the Olmsted County District Court dismissing appellants' actions and from its order denying a new trial. Both of these actions, which were consolidated for trial, arose out of a fire June 8, 1971, in a Rochester warehouse owned by respondents Phillip and Richard Halling, d.b.a. Halling Agency, Inc., and leased by respondent Frito-Lay Company. Appellants, both insurance companies, are seeking a recovery of the amounts paid their respective insureds for the losses they sustained as a result of the fire. The actions were tried to a jury. However, at the end of appellants' case the trial court granted defense motions for directed verdicts. We reverse.

The fire occurred in that portion of the Halling warehouse complex leased and occupied by Frito-Lay. This area consisted of two "bays," each approximately 25 feet wide and 100 feet deep, and separated by a two-by-four stud wall covered with a screen mesh. At the front of each bay was a large garage door and next to it an ordinary entrance door.

Located at the rear of one of Frito-Lay's bays (bay 6), in the southeast corner, was a gas space heater which was suspended from the ceiling. Attached to the back of the heater was an electrical junction box which supplied electricity to the heater. During the investigation of the fire by the fire prevention unit of the Rochester Fire Department, Chief Allen J. Smith discovered that, in addition to the conduit leading to and from the junction box, there was also ordinary appliance wiring. That wiring im-

properly left the box between the cover plate and the housing. Chief Smith also found, in that same location, a duplex outlet with appliance wire attached to it. The appliance wiring was of two different gauges and apparently spliced together.

An employee of Frito-Lay testified that he recalled seeing a duplex outlet in the southeast corner of bay 6 which he had used for a 2-week period, sometime prior to the fire, to power his radio. While stating that he never inspected the outlet or its wiring, he did testify that it was appliance wiring and led from the outlet in the direction of the heater, a distance of from 6 to 10 feet. He recalled that the outlet was attached to one of the two-by-four studs, but did not recall whether the wire was loose or attached to the studding also. He stated that the manner in which the outlet was wired did not appear to be professional. Respondent Halling's co-owner, Richard Halling, testified that he inspected bay 6 prior to the lease and did not recall seeing the outlet.

Chief Smith testified that the origin of the fire was the southeast corner of bay 6 toward the floor, but was not permitted to render an opinion as to the cause of the fire. Chief Smith also discovered in the course of his investigation that the electrical circuitry was overfused (25 to 30 amp. fuses for 15 amp. wiring) which he believed created a greater risk of fire from faulty wiring.

The lease between Frito-Lay and Halling was an oral one and did not spell out their respective maintenance functions. It appears, however, that the parties tacitly understood that Halling was responsible for the more major maintenance problems and Frito-Lay for minor problems. Halling had a key to the large garage door but not the smaller door.

The issues raised on appeal are: (1) Was the evidence sufficient to support a finding of negligence? (2) Did the trial court err in excluding appellants' expert opinion as to the cause of the fire? (3) Is this a proper case for application of the doctrine of res ipsa loquitur?

■ Viewing the evidence, as we must, in the light most favorable to the party against whom a verdict is directed, E. H. Renner & Sons, Inc. v. Primus, 295 Minn. 240, 203 N. W. 2d 832 (1973); Lovejoy v. Minneapolis-Moline Power Imp. Co. 248 Minn. 319, 79 N. W. 2d 688 (1956), we believe the record before us is sufficient to support a verdict of negligence as to both respondents. We begin with Frito-Lay.

Appellants' claim is that the wall outlet at the rear of bay 6 was negligently maintained by Frito-Lay and that that negligence was a direct cause of the fire which resulted in the losses sustained by their respective insureds.

In Segal v. Bloom Brothers Co. 249 Minn. 367, 372, 82 N. W. 2d 359, 363 (1957), we recognized that a tenant, in relation to his cotenants, is subject to "those common-law obligations of due care which ordinarily rest upon the owner of real property in his relationship to those who occupy adjoining premises." See, Rosenfield v. Arrol, 44 Minn. 395, 46 N. W. 768 (1890). Accordingly, a tenant is liable for harm caused a cotenant by a condition which the tenant realizes or should realize will involve an unreasonable risk of harm.

We believe that the evidence supports a finding that the manner in which the outlet at the rear of bay 6 was wired and maintained presented an unreasonable risk of harm. Chief Smith testified without objection that the manner in which the outlet was wired "[c]ould lead to a fire." Everett Hicks, the electrician who installed the original electrical wiring in the warehouse complex, testified that the manner in which the wiring of the outlet was done was not according to code.

"Q. No, you did not do the wiring; and no, it's not according to code?

"A. Right.

"Q. And is there a reason why we have—why do you say you do things according to code? Is that for safety purposes?

"A. Right.

"Q. Did you hear the testimony of Mr. Smith stating that there was some appliance wire of a different gauge?

"A. Uh-huh.

"Q. Is that a normal way to wire duplex receptacles?

"A. In what way?

"Q. Having two smaller gauges, or a large gauge appliance wire attached or spliced to—

"A. No."

We also believe that the evidence would support the finding that Frito-Lay knew or should have known of the unreasonable risk involved. James Lunde, the employee of Frito-Lay who used the warehouse most often, testified unequivocally that he was aware of the outlet and the manner in which it was wired, and that he in fact had used the outlet. Further, it can reasonably be inferred that he was aware that the wiring was improper.

"Q. Were you able to form an opinion whether or not this was a professional type of job, or did it look like a homemade job, so to speak?

"A. It didn't look like a professional job."

He did nothing to correct the situation nor did he inform his supervisors who regularly visited the warehouse site.

Frito-Lay urges that Halling's agreement to repair should insulate Frito-Lay from liability to appellants. We do not agree. Restatement, Torts 2d, § 378, Comment *b*, takes the following position, which we endorse:

"*b.* The fact that the lessor has contracted to repair the land, or to keep it in a safe condition, does not relieve the tenant from his duty to persons outside of the land to maintain it in safe condition. A person outside of the land injured by an unreasonably dangerous condition which the performance of the lessor's contract would have made safe may recover against either the lessor or the lessee."

For cases adopting that position, see, e. g., Lommori v. Milner Hotels, 63 N. Mex. 342, 319 P. 2d 949 (1957); Marzotto v. Gay

Garment Co. 11 N. J. Super. 368, 78 A. 2d 394, affirmed, 7 N. J. 116, 80 A. 2d 554 (1951) ; Johnson v. Prange-Guessenhainer Co. 240 Wis. 363, 2 N. W. 2d 723 (1942).

Halling's liability is alleged to arise out of two circumstances: First, its tacit agreement with Frito-Lay to keep the leased premises in repair, and second, the overfused circuitry. While we must conclude that the record as it stands now does not support a finding of negligence based on Halling's agreement to repair,[1] we believe it is sufficient with respect to the overfused circuitry.

Chief Smith discovered in the course of his investigation that the Frito-Lay electrical circuits were overfused. He testified that this condition would contribute to and increase the risk of fire from faulty wiring.

"Q. Do you recall, if at all, checking the fuse box in the building in your investigation?

"A. For Frito-Lay? For this area?

"Q. Yes.

"A. Yes, I do.

"Q. And what, if anything, did you find there?

"A. The fuses were blown, and they were overfused. They were 25- and 30-amp. fuses on 15-amp. circuit wiring.

---

[1] Although the record is far from clear with respect to the details of the oral lease, it appears that the agreement to repair did not impose a duty of inspection upon Halling but rather contemplated the giving of notice by Frito-Lay of the need for repairs. There is nothing in the record which would indicate that Frito-Lay ever requested Halling to correct the defectively wired outlet. See, Restatement, Torts 2d, § 378, Comment *a*, which incorporates the following comment to § 357: "*d*. Since the duty arises out of the existence of the contract to repair, the contract defines the extent of the duty. Unless it provides that the lessor shall inspect the land to ascertain the need of repairs, a contract to keep the premises in safe condition subjects the lessor to liability only if he does not exercise reasonable care after he has had notice of the need of repairs. In any case his obligation is only one of reasonable care."

"Q. And what significance, if anything, could you explain to the jury what these fuses might do?

"A. Well, if you overfuse building circuitry, you can have a fault within appliance wiring or building wiring that can go on without blowing the fuses immediately. What I'm saying is that you can have a fire more so if you overfuse than if you fuse the way it should be. Should be 15-amp. fuses. It's a safety valve if there's a fault in the wiring."

The record indicates that the electrical system for the warehouse was under Halling's control, and that it was responsible for its maintenance. The lease called for Halling to supply electricity to its tenants. The fusebox was located in a common bathroom shared by all of Halling's tenants. In fulfilling its obligation to maintain the electrical system, Halling was required to exercise reasonable care. We believe that the record presents a jury question as to whether Halling met this standard. See, Glidden v. Goodfellow, 124 Minn. 101, 144 N. W. 428 (1913); Hutchinson v. Des Moines Housing Corp. 248 Iowa 1121, 84 N. W. 2d 10 (1957).

■ The trial court sustained respondents' timely objection to Chief Smith's opinion as to the cause of the fire on the ground that it lacked foundation. He would apparently have testified that the cause was the defectively wired outlet. Respondents relied at trial on our decision in Rochester Wood Specialties, Inc. v. Rions, 286 Minn. 503, 176 N. W. 2d 548 (1970), and at oral argument directed our attention to our recent decision in Huseby v. Carlson, 306 Minn. 559, 238 N. W. 2d 589 (1975).

In Rochester Wood Specialties, we held that expert opinions should not have been admitted by the trial court; in Huseby, we affirmed the trial court's sustaining of an objection to an opinion which lacked adequate foundation. The reason for our decision in both cases was that the record failed to demonstrate that the opinions were based on a firsthand knowledge of the circumstances of the fire gleaned from a careful investigation, but instead were based on assumptions not supported by the evidence.

In the case at bar, the expert was at the scene of the fire immediately after its occurrence and made an extensive personal investigation of the circumstances of the fire and examination of the burned area. It was upon this firsthand information that he based his opinion. We believe it should have been admitted.

■ The final issue is the application of res ipsa loquitur to the instant case. Its application and nature are well settled in the decisions of this court. In Holten v. Parker, 302 Minn. 167, 173, 224 N. W. 2d 139, 144 (1974), we said:

"The doctrine of res ipsa loquitur in Minnesota is merely one form of circumstantial evidence creating a permissive inference of negligence. Rule 43.06, Rules of Civil Procedure. There are three requirements for the application of the doctrine under our decisions. They are as follows:

" '* * * (1) Plaintiff must have been injured by an apparatus or instrumentality whose nature is such that injury is not ordinarily to be expected in the absence of negligence; (2) at the time of the injury, both inspection and user must have been in the exclusive control of the defendant; and (3) the injurious condition or occurrence must not have been due to any voluntary action on the part of plaintiff.' Johnson v. Coca Cola Bottling Co. 235 Minn. 471, 476, 51 N. W. 2d 573, 576 (1952)."

Regardless of whether the doctrine would be applicable in a case involving loss arising out of a fire, appellants seem to have eliminated any need to resort to it on the record presented here. They have established a jury question through specific facts as to the possible negligence of both respondents, and with the admission of the expert opinion as to the causation of the fire. We believe that the doctrine is not applicable.

Reversed and remanded for a new trial.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.