BOHME, INC. et al., Appellants and Cross–Appellees,

v.

SPRINT INTERNATIONAL COMMUNICATIONS CORPORATION,
Appellee and Cross–Appellant.

[Cite as *Bohme, Inc. v. Sprint Internatl. Communications Corp.* (1996), 115 Ohio App.3d 723.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 70331.

Decided Nov. 25, 1996.

*Smith & Smith* and *Geoffrey R. Smith*, for appellants and cross-appellees.

*Weston, Hurd, Fallon, Paisley & Howley, Timothy D. Johnson* and *Gregory E. O'Brien* for appellee and cross–appellant.

JAMES M. PORTER, Judge.

Plaintiffs-appellants, Bohme, Inc. and its insurer, Aetna Insurance Company, appeal from a summary judgment entered by the trial court in favor of defendant-appellee Sprint International Communications Corporation on plaintiffs' claim that defendant Sprint or its predecessor was negligent in the maintenance of a rooftop air conditioning unit which caused electrical problems adversely affecting the operations of Bohme's graphic/printing business in the same building. Plaintiffs contend that disputed issues of material fact precluded the grant of summary judgment in defendant Sprint's favor, that Sprint was responsible for the negligent conduct of its independent contractors, and harm to plaintiffs was foreseeable from the defective installation or maintenance of the unit. We find merit in the appeal and reverse and remand.

Plaintiff Bohme, Inc. provides typesetting and graphic arts services to customers from its plant and offices on the fourth floor of the Caxton Building in downtown Cleveland. Sprint is a cotenant on the fourth floor. By 1992, Bohme had come to rely on two printer/output machines manufactured by Alphatype Corporation, known as the CRS 99000 Series machine, in producing a particular segment of its photographic typesetting. These machines are highly sensitive and susceptible to minor power fluctuations.

In April 1992, Bohme began experiencing imperfections in the product being generated by its Alphatype machines in that the printed or film product was intermittently marked with lines running through the finished material. The machines continued to produce unacceptable product over the next six months, during which Bohme and experts labored to find the source of the problem.

Originally, Bohme believed that the problem was caused by a defect in the equipment itself. Alphatronics, a Chicago company specializing in service and maintenance of Alphatype machines, was consulted, and despite numerous service calls and component replacements and adjustments, the problems persisted. During this service period, Bohme never advised the Caxton Building management or Sprint of its production difficulties.

On October 16, 1992, on a service call by the Alphatronics technician, a variance in the three-phase power servicing the Bohme premises was finally discovered. This came as a shock to Bohme personnel, who contacted the building manager and demanded that the problem be corrected. The Caxton Building retained Spectrum Electric and its president, William Rennie, to locate the source of the building ground causing the variance in the electrical power serving the Bohme premises. Rennie testified that he spent two full days, October 16 and 17, at the Caxton Building attempting to locate the source of the building ground through a process of elimination and trial and error.

Eventually, the ground was isolated in the fourth floor premises occupied by Sprint and traced to a rooftop condensing unit that was part of the air conditioning equipment serving the Sprint premises. Rennie discovered that some of the electrical connections had been made using improper materials and that the disconnected device on the unit had become corroded, allowing one of the three-phase wires to come in contact with the metal housing, causing the device to ground out. Rennie estimated that the condition had been in existence for six months to a year, and testified that the ground would not have prevented the air conditioning unit itself from continuing to operate properly.

The premises in the Caxton Building occupied by defendant Sprint had been occupied by various telecommunication companies since 1981, when Sprint's predecessor, GTE Telenet, leased the space. At that time, GTE Telenet provided the Caxton Building management with copies of detailed drawings and electrical specifications for the build-out of its space.

After a bidding process, the contract for installing the ten-ton Trane air conditioning system (including two five-ton compressors) was awarded to Cooling Systems, Inc., and the necessary electrical hookup and wiring to the GTE Telenet premises was awarded to Ed Godenswager, d.b.a. Ed's Electrical Service. The installation and electrical hookup of the air conditioning system was completed by February 9, 1982 in accordance with plans and applications on file with the city building department.

From March 1982 to September 1991, Cooling Systems provided monthly maintenance services to the rooftop air conditioning unit to ensure proper, normal operation. None of the Cooling Systems monthly reports revealed problems in the wiring, a potential for building-wide power fluctuations, or the need to repair or replace any electrical components.

In September 1991, Sprint contracted with York International to provide maintenance and repair services to its heating, ventilation and air conditioning equipment on a nationwide basis. York accordingly succeeded Cooling Systems in providing service and maintenance work on the rooftop air conditioning unit. The regularly scheduled service calls performed by York in April 1992 and June 1992 indicated no problems with the air conditioning equipment, other than the need to clean and/or change the filters more frequently than usual, due to excessive dirt and dust caused by the nearby Gateway construction.

On October 20, 1992, the Caxton Building management notified Sprint that Bohme had experienced malfunctions in its printing equipment which were traced to Sprint's rooftop air conditioning unit. Sprint retained Cooling Systems to remove the offending unit and install a new indoor air conditioner for its fourth floor premises. The replacement was completed by November 17, 1992.

Sprint had no problems with its air conditioning system between April and October 1992, and was unaware until the October 20 notice that Bohme was experiencing problems with voltage fluctuations, power shortages or equipment malfunctions in its business. No other tenant in the building was similarly affected.

Bohme brought this negligence action against Sprint, claiming damages from business interruptions resulting from the fluctuations in the electrical power supplied to its leased premises caused by the defective air conditioning unit serving Sprint's premises. Bohme subsequently filed an amended complaint, joining Aetna Insurance Company as a party-plaintiff, which claimed it was subrogated to some of the losses incurred by Bohme, which Aetna had indemnified.

Sprint answered and filed third-party claims for indemnity and contribution against Cooling Systems, York International and Ed Godenswager, d.b.a. Ed's Electrical Service, in the event that Sprint was found liable to the plaintiffs. Plaintiffs filed no direct claims against these third parties, and the statute of limitations for filing such claims has now expired.

Bohme and Sprint filed cross-motions for summary judgment. In support of its motion, Sprint filed transcripts of deposition testimony and affidavits of witnesses. Sprint contended that the undisputed facts established that the business interruptions and equipment malfunctions were not reasonably foreseeable consequences of any negligence on the part of Sprint or its independent contractors in installing or maintaining the rooftop air conditioner, and that Sprint had no actual or constructive knowledge of any defect that caused the problems. The plaintiffs contended that the undisputed facts established Sprint's responsibility for the defective installation or maintenance by its contractors.

The trial court found that "[i]t is reasonably foreseeable that a negligently installed or maintained air conditioner could cause damage to the electrical equipment of a co-tenant. Sprint owed Bohme, its fellow tenant, a duty of care to avoid such risks." The court found no evidence that Sprint knew of the problems or was directly negligent on its own part. The court considered at length the liability of Sprint for the acts or omissions of its independent contractors, Cooling Systems, York and Godenswager. After analyzing the three referenced exceptions (negligent retention, agency by estoppel, and inherently dangerous project) to the general rule that an employer is not liable for the negligence of an independent contractor, the court found none of these exceptions applicable. The court further found that the law of nuisance did not support the plaintiffs' cause.

The trial court finally concluded that Sprint could not be held liable for the negligence of its independent contractors in failing to properly install and/or maintain the equipment. On February 18, 1996, the trial court overruled

Bohme's motion and entered summary judgment in favor of Sprint. Sprint's third-party claims were dismissed as moot. This timely appeal followed.

Plaintiffs' sole assignment of error states as follows:

"The trial court erred when it granted summary judgment to appellee Sprint, finding that the duty owed by Sprint to appellant Bohme was limited to merely inspecting the air conditioner at issue."

We will in our discussion also address Sprint's cross-assignment of error, since it is inevitably intertwined with the subject of foreseeability. Sprint's cross-assignment states as follows:

"I. The trial court erred in holding that Sprint owed a duty of care to Bohme. Under the *Palsgraf* Doctrine, Sprint owed no duty to an unforeseeable plaintiff like Bohme, Inc.

"A. The risk of harm to Bohme's equipment was not within Sprint's 'range of apprehension' when it contracted with others for the installation and maintenance of the rooftop air conditioning equipment."

■ Actionable negligence requires the showing of a duty, the breach of that duty and an injury proximately resulting therefrom. *Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.* (1989), 45 Ohio St.3d 171, 173, 543 N.E.2d 769, 772; *Jeffers v. Olexo* (1989), 43 Ohio St.3d 140, 142, 539 N.E.2d 614, 616–617.

■ "Under the law of negligence, a defendant's duty to a plaintiff depends upon the relationship between the parties and the foreseeability of injury to someone in plaintiff's position * * *. Injury is foreseeable if a defendant knew or should have known that its act was likely to result in harm to someone * * *." *Simmers v. Bentley Constr. Co.* (1992), 64 Ohio St.3d 642, 645, 597 N.E.2d 504, 507. It is a well-established rule of law that in order to owe a duty of care, it is not necessary that the defendant foresee the injury in the precise form in which it occurred. See *Pavlides v. Niles Gun Show, Inc.* (1994), 93 Ohio App.3d 46, 637 N.E.2d 404 (holding that an actor cannot necessarily avoid the imposition of a legal duty merely because he did not foresee the exact consequences of his actions). Rather, it is sufficient if defendant's action or inaction was likely to result in an injury to someone. *Mudrich v. Std. Oil Co.* (1950), 153 Ohio St. 31, 41 O.O. 117, 90 N.E.2d 859; *Gedeon v. E. Ohio Gas Co.* (1934), 128 Ohio St. 335, 190 N.E. 924.

■ The existence of a duty in a negligence action is generally a question of law for the court to determine. *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265, 269–270. However, the breach of that duty, *i.e.*, whether a defendant properly discharged his duty of care, is normally a question for the jury. *Commerce & Industry Ins. Co. v. Toledo* (1989), 45 Ohio St.3d 96, 98, 543

N.E.2d 1188, 1192; *Smith v. Cincinnati Gas & Elec. Co.* (1991), 75 Ohio App.3d 567, 569, 600 N.E.2d 325, 326–327; *Mueller v. Ameritrust Corp.* (July 18, 1991), Cuyahoga App. No. 58525, unreported, at 3, 1991 WL 144324; *Keister v. Park Centre Lanes* (1981), 3 Ohio App.3d 19, 24, 3 OBR 20, 25–26, 443 N.E.2d 532, 536–537.

■ The determination of this appeal turns on whether (1) Sprint had a duty to avoid the injury which resulted to the plaintiff, and (2) whether it breached that duty through the conduct of its independent contractors in the faulty installation or maintenance of the air conditioning unit. The trial court held, "It is reasonably foreseeable that a negligently installed or maintained air conditioner could cause damage to the electrical equipment of a co-tenant. Sprint owed Bohme, its fellow tenant, a duty of care to avoid such risks." However, the court went on to find that "the installation and maintenance of an air conditioning unit contains no unusual element of danger," *i.e.*, was not "inherently dangerous." Therefore, the court found that defendant Sprint was not vicariously liable under the doctrine of *respondeat superior.* We agree with the trial court that Sprint owed a duty of due care to its cotenant, but we cannot agree with its analysis of the scope of that duty or defendant's breach thereof.

■ As a general proposition, "a lessee of a portion of a building leased to several tenants is liable to a cotenant for damage to the latter's property arising from the negligence of the former with respect to the part of the building leased to him." 52 Corpus Juris Secundum (1968) 215, Landlord & Tenant, Section 438. This principle finds support, for example, in cases where a tenant of adjoining premises allows water to overflow or escape, causing injury to the lower tenement. *Heil v. Proctor* (1919), 12 Ohio App. 35, 38 (obstruction of sink by upper floor tenant liable for water overflowing sink and causing damage on lower floors); *United States Trunk Co. v. Bristol Knitting Mills, Inc.* (1962), 344 Mass. 249, 182 N.E.2d 131 (fifth floor tenant liable to lower floor tenant for damage due to water leaking from frozen pipe caused by windows left open on fifth floor); *Anderson Hotels of Louisiana v. Seibert* (1948), 213 Ark. 624, 211 S.W.2d 876 (upper floor tenant liable for lower floor tenant for water damage caused by upper floor tenant's defective plumbing); *S. Bell Tel. & Telegraph Co. v. Yates* (1950), 34 Tenn.App. 98, 232 S.W.2d 796 (upper level tenant liable for water damage to cotenant's property due to tenant's employee leaving water faucet on); *Brian v. B. Sopkin & Sons* (1943), 314 Mass. 180, 49 N.E.2d 894 (since upper level tenant had notice of water leakage problem, it is liable for water damage to lower level tenant). See, also, *Gen. Acc. Fire & Life Assur. Co. v. Frito–Lay Co.* (1976), 309 Minn. 116, 243 N.W.2d 726 (tenant liable to cotenant for damage caused by fire due to improper electrical wiring); *Pig'n Whistle Corp. v. Scenic Photo Pub. Co.* (C.A.9, 1932), 57 F.2d 854 (restaurant tenant liable to cotenant for

fire damage caused by grease fumes in the ventilation shaft). But the principle is only applicable where the defendant is guilty of negligence in causing or allowing the mishap to occur.

From the prima facie evidence below, it is apparent that one or more of the contractors (Cooling Systems, York or Godenswager) failed to exercise ordinary care (*i.e.,* meet code standards or good practices) in installing or maintaining the air conditioning unit.

William Rennie, the expert electrician from Spectrum Electric who examined the unit when the problem was discovered in October 1992, described what he found to be a number of code violations: plastic piping, wire through a plumbing ninety-degree connector, no flexible conduit feeding the equipment, there was no ground wire present, and the safety or disconnect switch was an indoor safety switch instead of the outdoor safety switch that should have been present. The box housing the disconnect switch unit was also in a metal box meant for indoor use. This contributed to the corrosion of the wiring.

Moreover, Rennie found that the unit had been negligently maintained, and based on his observations, it appeared that the corrosion had existed for "a long time. At least six months or a year, I guess." There was no testimony or evidence to dispute Rennie's findings.

The critical issue then becomes whether the conduct and knowledge of Sprint's contractors can be imputed to Sprint in view of the facts that it owned the air conditioning unit and was responsible for installing and maintaining it *vis-a-vis* the landlord and its cotenants.

██ Sprint places great emphasis on its and everybody else's lack of knowledge as to the defects in the electrical system. However, it is not necessary that a defendant have actual knowledge of a defective condition as a predicate for its duty of care when, in fact, it is the defendant who has created the hazardous condition. This was explained recently by this court in *Crane v. Lakewood Hosp.* (1995), 103 Ohio App.3d 129, 136–137, 658 N.E.2d 1088, 1092–1093:

"When it is the property owner itself which creates the hazardous condition which causes the plaintiff's injury, then the plaintiff need not show that the owner had knowledge or notice of the condition at issue. *Presley* [*v. Norwood* (1973)], 36 Ohio St.2d [29] at 31, 65 O.O.2d [129] at 130, 303 N.E.2d [81] at 83–84. This sensible rule follows because one who has created the condition is presumed to know what it created. See, *e.g., Tandy v. St. Anthony Hosp.* (Nov. 29, 1988), Franklin App. No. 88AP–551, unreported, 1988 WL 129161. *Tandy* is directly on point with the facts at bar. In *Tandy*, the court of appeals reversed the trial court's entry of summary judgment in favor of the defendant. The court stated:

" 'It is not defendant's lack of notice which is determinative, but, rather, whether [the defendant] negligently placed the doormat in such a position as to create a dangerous or hazardous condition. The evidence presented by defendant states merely that no complaints have been received, and there were no prior reported falls. This does not negate defendant's creating a dangerous condition, which caused plaintiff to fall and be injured.' *Tandy* at 2.

"See, also, *Guilford v. Cent. Hardware Co.* (1989), 62 Ohio App.3d 58, 574 N.E.2d 564 (evidence indicated that store owner created hazardous condition by .placing splintered rake on display, therefore knowledge or notice not required to be shown); *Stephens v. Akron Palace Theatre Corp.* (1936), 53 Ohio App. 434, 436–437, 7 O.O. 282, 282–283, 5 N.E.2d 499, 500; *Fox v. Ben Schechter & Co.* (1937), 57 Ohio App. 275, 277, 9 O.O. 101, 102, 13 N.E.2d 730, 731."

■ If the conduct and knowledge of the independent contractors are legally imputed to Sprint, then it can be found to have a duty to Bohme to avoid the harm that resulted. We find that in the peculiar circumstances of this case, if the work assigned to the independent contractors was inherently dangerous, the negligence of the contractors may be imputed to Sprint and it is not exonerated by virtue of the fact that they may have been independent contractors in the legal sense. We find the trial court in error in holding otherwise.

The leading Ohio Supreme Court case on this issue is *Richman Bros. v. Miller* (1936), 131 Ohio St. 424, 6 O.O. 119, 3 N.E.2d 360, which has never been overruled and which states as follows in the syllabus:

"1. Where danger to others is likely to attend the doing of certain work unless care is observed, the person having it to do is under a duty to see that it is done with reasonable care, and cannot, by the employment of an independent contractor, relieve himself from liability for injuries resulting to others from the negligence of the contractor or his servants.

"2. When a person employs a contractor to do work in a place where the public are in the habit of passing, which work will, unless precautions are taken, cause danger to the public, an obligation is thrown upon the person who orders the work to be done to see that reasonable precautions are taken to prevent injury.

"3. The duty to refrain from interfering with the right of the public to safe and unimpeded use of highways and streets is one of which an employer cannot divest himself by committing the work to a contractor.

"4. One who erects and maintains a large electric sign projecting over the street from his building has a duty to prevent its becoming a cause of danger to the traveling public by reason of any defect, either in structure, repair or use, against which reasonable skill can guard. Such duty arises from the danger to

others incident to the maintenance of such sign and the performance of any work in its repair where located, which duty he cannot avoid or shift to another by means of any contract."

In this case, Richman Bros. constructed a large electric sign off the face of its building over a public sidewalk which Ohio Edison contracted to renew, inspect and keep clean. Ohio Edison contracted out the painting of the sign to Walker Sign Company, an independent contractor. In the course of this painting, an employee of the sign company permitted a bucket of paint to fall, striking a cornice of the building and thereafter injuring the plaintiff pedestrian on the street below. The Supreme Court affirmed the jury's finding that Richman Bros. was liable for the acts of the independent contractor despite the fact it obviously had no reason to know that such a bizarre event would occur while a pedestrian was fortuitously passing by. The court explained the rationale for its ruling by quoting *Covington & Cincinnati Bridge Co. v. Steinbrock & Patrick* (1899), 61 Ohio St. 215, 229, 55 N.E. 618, 621:

" 'It is urged as unreasonable that one who has work to perform, that he himself cannot perform, from want of knowledge or skill, should be held liable for the negligence of one whom he employed to do it, since, if he did reserve control, it would avail nothing from his own want of knowledge and skill. There is seeming force to this, but only so. It is not agreeable to the principles of distributive justice. For it is equally a hardship that one should suffer loss by the negligent performance of work which another procured to be done for his own benefit, and which he in no way promoted and over which he had no control. Hence where work is to be done that may endanger others, there is no real hardship in holding the party, for whom it is done, responsible for neglect in doing it. Though he may not be able to do it himself, or intelligently supervise it, he will nevertheless, be the more careful in selecting an agent to act for him." *Richman Bros.*, 131 Ohio St. at 432, 6 O.O. at 123, 3 N.E.2d at 364.

It seems to us that the principle of vicarious liability has all the more force when the injured party is a cotenant sharing the same electrical system rather than simply an unfortunate passerby from the public at large.

We also note that the vitality of the *Richman Bros.* case was recently recognized by this court in *Nagorski v. Valley View* (1993), 87 Ohio App.3d 605, 622 N.E.2d 1088, where the defendant, Target Builders, claimed it was not liable for the noise, dust and flooding resulting from its subcontractor's activities in excavating for a new building. We reversed summary judgment for Target, stating as follows:

"As to Target's liability as a general contractor for the negligence of its subcontractor, the law in Ohio holds that:

" 'Where danger to others is likely to attend the doing of certain work, unless care is observed, the person having it to do, is under a duty to see that it is done with reasonable care, and cannot, by the employment of an independent contractor, relieve himself from liability for injuries resulting to others from the negligence of the contractor or his servants.' *Richman Bros. v. Miller* (1936), 131 Ohio St. 424, 6 O.O. 119, 3 N.E.2d 360, at paragraph one of the syllabus; *Covington & Cincinnati Bridge Co. v. Steinbock & Patrick* (1899), 61 Ohio St. 215, 55 N.E. 618, at paragraph one of the syllabus. See, also, *S. Ohio RR. Co. v. Morey* (1890), 47 Ohio St. 207, 24 N.E. 269, at paragraph three of the syllabus.

"It is clear from the line of cases cited by the Ohio Supreme Court in *Richman* and *Covington* that excavation work is precisely the type of activity meant to be excepted from the general rule of nonliability as to the general contractor for a subcontractor's negligence. Target took a project which was inherently dangerous to other persons and property if not done with reasonable care. The village's permit specified the precautions to be taken by the excavators in order to prevent damage to the adjacent property. It is unclear from any of the submitted briefs, attached affidavits or appellant's deposition whether Target or its subcontractor followed the conditions set by the village's permit. This is an issue of fact which would necessarily be determined upon remand to the trial court. Under the law, Target is not immune from liability of its subcontractor's negligence if it stemmed directly from the excavating work, as appellant alleges. See *S. Ohio RR. Co. v. Morey, supra.*" *Nagorski,* 87 Ohio App.3d at 608–609, 622 N.E.2d at 1090.

We find that the outcome of this appeal turns on whether the installation and maintenance of a rooftop air conditioning unit was inherently dangerous work which Sprint could not legally delegate to its independent contractor and avoid vicarious liability. As the trial court recognized in its thoughtful opinion, "An employer is liable for injuries caused by the failure of an independent contractor to exercise due care in the performance of work which is inherently or intrinsically dangerous * * * however skillfully done." Although the court recognized that the question of what is inherently dangerous work "is not always readily divined," it concluded that "the installation and maintenance of an air conditioning unit contains no unusual element of danger" and that the independent contractor's alleged failures created a "collateral risk" of harm not inherent or peculiar to the task of installing or maintaining the unit. We agree with the trial court that the determination of what is inherently dangerous is indeed a difficult issue, and it is made no easier by the facts of the instant case.

We take judicial notice of the fact that the forces of electricity are commonly known to be dangerous and capable of substantial mischief if not properly channeled and directed. "Electricity is a dangerous and deadly instrumentality, harmless if properly handled, but of such tension and so dangerous if allowed to

escape, that injury is sure to happen to persons or property coming in contact with it." 40 Ohio Jurisprudence 3d (1982) 146, Energy, Section 117. See, also, *Hetrick v. Marion–Reserve Power Co.* (1943), 141 Ohio St. 347, 355, 25 O.O. 467, 470–471, 48 N.E.2d 103, 107; *Best v. Energized Substation Serv.* (1993), 88 Ohio App.3d 109, 114, 623 N.E.2d 158, 161–162; *Gross v. Western–Southern Life Ins. Co.* (1993), 85 Ohio App.3d 662, 669, 621 N.E.2d 412, 416–417. It is for that reason that expert electricians are retained time and again to ensure the proper installation and hookup of electrical facilities and transmission lines, which are not entrusted to the untutored layman. It is also common knowledge that improperly grounded electrical equipment can cause short circuits, equipment malfunctions, or fires. We are not prepared to say that the improper installation and maintenance of a ten-ton air conditioning unit with its accompanying electrical components and wiring presents an innocuous or harmless risk of injury to those in its vicinity.

For the very reason that the determination of "inherently dangerous" presents an issue about which reasonable minds may differ, in this particular case, the matter should be submitted to a jury under proper instructions rather than determined on summary judgment, as a matter of law. We are guided in this conclusion by the Ohio Supreme Court decision in *Warden v. Pennsylvania R. Co.* (1931), 123 Ohio St. 304, 175 N.E. 207, where the railroad and its contractor were held jointly liable on a jury verdict to a motorcycle policeman who struck a plank protruding from a temporary trestle over a public street. The trial court declined to rule on whether the trestle work was inherently dangerous and submitted the issue to the jury. Our court of appeals reversed, but was overruled on appeal. The Supreme Court found no error in the trial court's procedure and stated:

"The question of responsibility of an owner for the negligence of an independent contractor may be one of law, or of fact, or of mixed law and fact, depending upon the circumstances of the particular case. The court of common pleas proceeded upon the theory that it was a question of mixed law and fact, and left the liability of the owner to the determination of the jury, upon instruction, in harmony with the case of *Covington & Cincinnati Bridge Co. v. Steinbrock & Patrick,* 61 Ohio St., 215, 55 N.E., 618, 76 Am.St.Rep., 375. The Court of Appeals reversed the judgment against the railroad company, holding that it was not guilty of any negligence. The reversal by the Court of Appeals was evidently upon the theory that there was nothing inherently dangerous in the work, and that the contractor was in full charge of its details.

"The circumstances surrounding the execution of a contract by an independent contractor might be such that it could properly be stated that, as a matter of law, there would be no liability on the part of the owner. On the other hand, the

circumstances might be such as to make it very clear that the owner would carry a legal responsibility for the negligence of the contractor, to be determined by the court without submission to the jury. Between these two extremes, the circumstances may be so complicated that minds might easily differ as to the danger attendant upon the execution of the work, resulting in different conclusions as to the duty of the owner to exercise care to avoid injury to third persons.

"The case at bar is in the twilight zone between the two extremes, and this fact is demonstrated by the disagreement between the trial court and the Court of Appeals. The principle declared in *Covington & Cincinnati Bridge Co. v. Steinbrock & Patrick, supra,* is directly applicable to this case, because the construction was upon and over a public thoroughfare, and the traffic was not diverted from that particular location, but, on the contrary, streets cars, the ordinary vehicular traffic, and pedestrians, were permitted to pass under the trestle at all hours during the construction of the work.

"We are of the opinion, therefore, that the trial court did not err in submitting this question to the jury under proper instructions, and that the Court of Appeals erred in reversing the judgment upon that ground." *Warden,* 123 Ohio St. at 307–309, 175 N.E. at 208–209.

Having found that a duty extended from Sprint to its cotenant Bohme, we next determine whether Sprint breached that duty through the conduct of its independent contractors. The breach of duty is ordinarily a question of fact, as we have previously noted. Given the fact that reasonable minds could disagree over whether the work assigned to the independent contractors was inherently dangerous, this breach of duty issue presented a genuine issue of material fact unsuited to summary judgment.

This conclusion is also supported by other cases with similar fact situations involving cotenants or adjoining landowners.

In *W. Stock Ctr., Inc. v. Sevit, Inc.* (Colo.1978), 195 Colo. 372, 578 P.2d 1045 (en banc), the plaintiff tenant claimed that the landlord was liable for the negligence of its independent contractor cutting pipes with an electric torch which caused a fire and destroyed the building in which plaintiff was a tenant. In holding that the inherent-danger exception was properly submitted to the jury, the court analyzed the Restatement provisions as follows:

"When this exception is applicable, 'the law invokes the theory of respondeat superior, imposing the master-servant relationship upon the parties engaged in the activity * * *.' *Epperly v. City of Seattle,* 65 Wash.2d 777, 399 P.2d 591. The exception was adopted by the Second Restatement [of Torts] and reads as follows:

" ' § 427. Negligence as to Danger Inherent in the Work

" 'One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.'

"*Restatement (Second) of Torts § 427.*

"A difficult question is what constitutes an 'inherently dangerous' activity. The authors of the Second Restatement comment that: 'the rule applies equally to work which, although not highly dangerous, involves a risk recognizable in advance that danger inherent in the work itself, or in the ordinary or prescribed way of doing it, may cause harm to others.' *Restatement (Second) of Torts § 427 (Comment c).* Thus, an inherently dangerous activity need not be extremely or even highly dangerous, but must only present a foreseeable and significant risk of harm to others if not carefully carried out. The determination of what constitutes an inherently dangerous activity should be made by the trier of fact, which is in the best position to evaluate the inherent danger of the work in different circumstances. *Accord, Schultz & Lindsay Construction Co. v. Erickson,* 352 F.2d 425 (8th Cir.).

" \* \* \*

"In the present case, it is clear that the vicarious liability issue should have been submitted to the jury. There is sufficient evidence that the independent contractor was negligent and that this negligence proximately caused damage to the tenant. There is also sufficient evidence from which a jury could conclude that use of an electric cutting torch in these circumstances was inherently dangerous. We also hold that the liability imposed may permit recovery for property damage as well as for incidental and consequential damages when an independent contractor employed by a landlord causes damage to a tenant." *W. Stock Ctr.,* 578 P.2d at 1050–1051. See, also, *Levy v. Currier* (D.C.App.1991), 587 A.2d 205, 210 (whether use of acetylene torch to cut fire escape from townhouse "is inherently dangerous is an additional question of fact left unanswered by the trial court"); *Benesh v. New Era, Inc.* (1991), 207 Ill.App.3d 1049, 152 Ill.Dec. 902, 566 N.E.2d 779 (evidence sufficient to show that spray painting was inherently dangerous and would cause damage to neighboring fence and property).

Other recent cases precluding summary judgment on the inherent-danger issue are *Doak v. Green* (Fla.App.1996), 677 So.2d 301 (issue of fact regarding whether hauling logs is an inherently dangerous activity precluded summary judgment); *Phillips v. Mazda Motor Mfg. (USA) Corp.* (1994), 204 Mich.App. 401, 516 N.W.2d 502 (jury question whether construction worker's job of connecting top of

columns in structural framework with steel beams is inherently dangerous); *Woodson v. Rowland* (1991), 329 N.C. 330, 407 S.E.2d 222 (whether trenching project was inherently dangerous is an issue of fact precluding summary judgment); *Falls v. Scott* (1991), 249 Kan. 54, 815 P.2d 1104 (whether use of Brush Hog mowing machine is inherently dangerous is question for jury); *Nance v. Leritz* (Mo.App.1990), 785 S.W.2d 790 (jury question whether tuckpointing of one-hundred-year-old building was inherently dangerous task).

Plaintiffs' sole assignment of error is sustained, defendant's cross-assignment of error is overruled, and the cause is remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

PATRICIA A. BLACKMON, P.J., and TIMOTHY E. McMONAGLE, J., concur.