OPINION
Defendants-appellants, Ed Hershberger and Daniel Troyer, appeal a decision of the Columbiana County Common Pleas Court finding them liable for damage done to the property of plaintiff-appellee, Peter C. Johnson.
Frank Hagan (Hagan) and plaintiff-appellee, Peter C. Johnson (Johnson), own adjoining pieces of land in Columbiana County, Ohio, which are substantially wooded. In the spring of 1996, Hagan decided to sell some of the trees from his woods. He contacted the Ohio Department of Natural Resources (ODNR), Forestry Division. Two foresters from ODNR went to Hagan's property and assisted him in selecting which tress to cut since he did not want the property to be clear-cut[1]. The foresters marked 368 trees.
Hagan advertised the trees for sale. On February 4, 1996, Defendant R.W. "Red" Thomas (Thomas), a timber broker, purchased the trees for $76,400. Hagan and Thomas signed a written contract requiring that good logging practices be used and that slash[2] be kept from adjacent landowners' property. (Plaintiff's Exhibit 1).
Thomas then contacted defendant-appellee, Ed Hershberger (Hershberger), a logger. Hershberger and Thomas walked the property and Hershberger indicated that he was interested in purchasing the trees. Unable to finance such a purchase, Hershberger turned to defendant-appellee, Dan Troyer (Troyer), a sawmill owner. Troyer, operating under the belief that he was purchasing all trees 24 inches in diameter or larger, agreed to pay for the trees, pay Thomas' $10,000 commission, and pay Hershberger a $500 finder's fee. Troyer also agreed to have Hershberger log the property.
On May 6, 1996, Hershberger and Thomas signed a contract indicating that Hershberger could cut all trees 24 inches in diameter or larger. Troyer then issued a check to Hershberger Logging for $10,500. (Defendant's Exhibit C). Hershberger paid Thomas his $10,000 commission and retained the remaining $500 for his finder's fee. Troyer tendered a cashier's check to Hagan in the amount of $76,400 for the purchase price of the trees.
After walking the property with Hershberger, Troyer gave Hershberger the go-ahead to begin logging. Hershberger brought in his equipment which included a skidder[3] and chain saws. Hershberger did not have a bulldozer needed to straighten any ruts in the property and to pull back and crush any slash. However, Troyer provided him with one and paid him to operate it. Hershberger contracted with a trucker to haul the logs to Troyer.
After consulting with Hagan, Hershberger had a general idea where the property line was and cut only those trees that were marked. However, Hershberger entered into a side agreement with Hagan which allowed Hershberger to cut certain other trees on Hagan's property.
Hagan was present almost every day of the logging operation. He would mark the stumps of trees that were cut in order to keep track of what trees were cut by Hershberger and to make sure only the proper trees were cut.
No survey was done of the property line and Hershberger could not find one of the pegs that marked the property line between Hagan's and Johnson's property.
In the process of the logging operation, Hershberger felled one of Johnson's trees on Johnson's property. Johnson took notice of the logging operation and the felled tree and approached Hershberger. They discussed the location of the property line. Johnson informed Hershberger that he had felled one of the trees on his property.
Subsequently, Hershberger continued the logging operation, causing more trees to fall on Johnson's property. In addition, Hershberger left slash from other trees on Johnson's property and covered up a bridle trail Johnson had cut through the woods on his property. Hershberger still made no further attempt to ascertain the property line.
The logging continued over a substantial period of time due to the weather. The logs were transported to Troyer's Lumber where they were sawn and eventually sold. Hershberger was paid $70.00 per board foot for cutting and skidding the trees. He was also paid extra for some hauling of the logs.
On May 29, 1998, Johnson filed a complaint against Hershberger alleging negligence and setting forth a statutory cause of action under R.C. 901.51. That section provides:
 "No person, without privilege to do so, shall recklessly cut down, destroy, girdle, or otherwise injure a vine, bush, shrub, sapling, tree, or crop standing or growing on the land of another or upon public land.
 "In addition to the penalty provided in section 901.99 of the Revised Code, whoever violates this section is liable in treble damages for the injury caused."
After learning of Troyer's and Thomas' involvement through discovery, Johnson filed an amended complaint adding as party defendants R.W. Thomas, the Thomas Timber Co., Dan Troyer, and the Troyer Lumber Co. Johnson alleged that Hershberger, Troyer, and Thomas were joint venturers and, therefore, jointly liable.
Thomas never answered and a default judgment was entered against him. Troyer filed a motion for summary judgment which was denied.
The case proceeded to a bench trial on June 7, 1999. The trial court judge viewed the property in question. Each party then proceeded to present evidence and testimony. The court filed findings of fact and conclusions of law on June 25, 1999. The court found Hershberger's conduct to be negligent and reckless. Although the court found that there was no joint venture, it nevertheless found Troyer liable pursuant to the inherently dangerous exception to the general principles of agency law dealing with independent contractors. The court awarded restoration costs and treble damages. Both Hershberger and Troyer have appealed the trial court's decision.
Troyer sets forth three assignments of error on appeal. Troyer alleges in his first assignment of error that:
 "The Trial Court committed error when it found as a matter of law that Defendant Troyer was liable for the negligent and reckless conduct of Defendant Hershberger."
The trial court found Troyer liable pursuant to the inherently dangerous exception to the general principles of agency law dealing with independent contractors.
"Where danger to others is likely to attend the doing of certain work, unless care is observed, the person having it to do, is under a duty to see that it is done with reasonable care, and cannot, by the employment of an independent contractor, relieve himself from liability for injuries resulting to others from the negligence of the contractor or his servants." Richman Bros. v.Miller (1936), 131 Ohio St. 424, at paragraph one of the syllabus;Covington Cincinnati Bridge Co. v. Steinbock Patrick (1899),61 Ohio St. 215, at paragraph one of the syllabus. See, also, S.Ohio RR. Co. v. Morey (1890), 47 Ohio St. 207, 24 N.E. 269, at paragraph three of the syllabus; Nagorski v. Valley View (1993),87 Ohio App.3d 605, 608.
As Troyer correctly observes, application of this legal principle requires that the work be inherently or naturally dangerous. Troyer argues that the evidence in this case does not support the trial court's finding that logging is either an inherently or naturally dangerous activity. Troyer refers to the testimony of David Hershberger (no relation to defendant-appellee, Ed Hershberger) who indicated that logging can be a dangerous activity and that if one is not careful, they could lose a limb or be killed. Troyer also cites to the testimony of logger Ira J. Mowrer who stated that he pays a higher workers' compensation premium based on the danger of logging.
Troyer asserts that all this testimony established was that logging can be dangerous and that injuries can occur if due care is not taken. Troyer concludes that the evidence was insufficient to establish that logging is inherently dangerous.
Ohio case law has not really set forth a clear standard for determining whether a certain type of work is "inherently," "intrinsically," or "naturally" dangerous. Courts have approached the issue on a case-by-case basis looking at the particular work involved including the attendant facts and circumstances. It is an issue that turns so strongly upon the given facts and circumstances of a particular case that courts have stressed it is a decision that is best left to the trier of fact. See Bohme, Inc.v. Sprint Internatl. Communications Corp. (1996), 115 Ohio App.3d 723,734; Nagorski, 87 Ohio App.3d 605, 608-609.
Nevertheless, the determination of whether the work is "inherently," "intrinsically," or "naturally" dangerous must be subject to some appellate review and cast against some articulable standard. Given the highly factual nature of the determination, the best standard by which to evaluate the decision is probably "weight of the evidence." Additional guidance can be found in the Restatement of Law 2d, Torts (1965), Section 427, Comment b, which states:
 "The rule stated in this Section is commonly expressed by the courts in terms of liability of the employer for negligence of the contractor in doing work which is `inherently' or `intrinsically' dangerous. It is not, however, necessary to the employer's liability that the work be of a kind which cannot be done without a risk of harm to others, or that it be of a kind which involves a high degree of risk of such harm, or that the risk be one of very serious harm, such as death or serious bodily injury. It is not necessary that the work call for any special skill or care in doing it. It is sufficient that work of any kind involves a risk, recognizable in advance, of physical harm to others inherent in the work itself, or normally to be expected in the ordinary course of the usual or prescribed way of doing it, or that the employer has special reason to contemplate such a risk under the particular circumstances under which the work is to be done."
A review of those cases finding a particular activity to be "inherently," "intrinsically," or "naturally" dangerous reveals that the exception is applied primarily to protect against harm to persons. The Restatement also indicates that the policy behind such an exception is for the protection of persons against death and serious bodily injury. The damage done in this case was to property only.
Moreover, in this particular case, there was no evidence presented that the work was of a kind which cannot be done without a risk of harm to others, or that it is of a kind which involves a high degree of risk of such harm, or that the risk is one of very serious harm, such as death or serious bodily injury. To the contrary, David Hershberger testified that logging can be a dangerous activity if one is not careful.
Accordingly, Troyer's first assignment of error has merit.
Troyer alleges in his second assignment of error that:
 "The Trial Court erred to the prejudice of Defendant Dan Troyer when it permitted Plaintiff in mid-trial to use a surprise witness as an expert witness."
Troyer alleges in his third assignment of error that:
 "The Trial Court committed error when it determined that restoration damages are the proper measure of damages, that those damages should be based on the value of nursery stock and amounted to $31,100 for replacement of the trees and that those damages should be trebled."
These assignments of error are rendered moot by our disposition of Troyer's first assignment of error. See App.R. 12(A)(1)(c).
On appeal, Hershberger asserts five assignments of error. Hershberger alleges in his first assignment of error that:
 "THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO CONFINE DAMAGES TO CLEANING AND REMOVING OF THE `SLASH'."
Hershberger cites to portions of the trial transcript where Johnson related to the court conversations he had with Hershberger during the logging operation. Specifically, Johnson testified that Hershberger promised him that he would clean and remove the slash. Hershberger also cites to testimony of a backhoe operator who testified that it would cost about $3,000 to clean and remove the slash. The crux of Hershberger's argument is that he could only be held liable to the extent that he failed to perform his promise to clean and remove the slash. Hershberger equates his failure to perform this promise as a "breach of contract" thereby limiting Johnson's damages to $3,000.
Hershberger's argument clearly ignores the legal theory under which this case was tried and decided. Hershberger was found to have negligently and recklessly damaged Johnson's property. Breach of contract was neither alleged by Johnson or pursued at trial. According to law, Johnson was entitled to restoration and treble damages.
Accordingly, Hershberger's first assignment of error is without merit.
Hershberger alleges in his second assignment of error that:
 "THE TRIAL COURT COMMITTED REVERSIBLE ERROR IMPUTING NEGLIGENCE TO DEFENDANT TROYER BASED UPON NEGLIGENCE OF DEFENDANT HERSHBERGER, AN INDEPENDENT CONTRACTOR, WHEN IT WAS NOT PLEADED NOR PROVEN."
The trial court found Hershberger and Troyer liable based upon the inherently dangerous exception to the general principles of agency law dealing with independent contractors. As Hershberger correctly notes, this theory was not set forth in appellee's complaint. However, the case was tried, in part, on this theory and neither party objected thereby waiving the issue for appeal to this court.
Furthermore, Civ.R. 15(B) provides in relevant part:
 "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment. Failure to amend as provided herein does not affect the result of the trial of these issues."
Although we find that the trial court did not error in permitting appellee to argue a theory of imputing negligence to Troyer based upon the negligence of Hershberger, we also find that the balance of this assignment of error is rendered moot based on our disposition of Troyer's first assignment of error.
Accordingly, Hershberger's second assignment of error is without merit.
Hershberger alleges in his third assignment of error that:
 "THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ASSESSING DAMAGES TO THE DEFENDANT THOMAS WHEN HE WAS NOT AN AGENT OR INDEPENDENT CONTRACTOR."
Again, Hershberger's argument under this assignment of error clearly ignores the legal theory under which this case was tried and decided. Furthermore, Hershberger lacks standing to challenge damages assessed against Thomas, a party who is in default judgment and has not pursued an appeal.
Accordingly, Hershberger's third assignment of error is without merit.
Hershberger alleges in his fourth assignment of error that:
 "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FINDING THE DEFENDANT TO BE RECKLESS AND ASSESSING TRIPLE DAMAGES UNDER R.C. 901.51."
Hershberger argues that there was insufficient evidence that he acted recklessly, a prerequisite to treble damages.
In Wooten v. Knisley (1997), 79 Ohio St.3d 282, 289-290, the Ohio Supreme Court held that "the term `recklessly,' as that term is used in R.C. 901.51, has the same meaning in a civil claim for treble damages under R.C. 901.51 as it does in a criminal proceeding involving a violation of that statute. Specifically, the term `recklessly,' as it is used in R.C. 901.51, is defined in R.C. 2901.22(C)." R.C. 2901.22(C) provides:
 "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."
In this case, Hershberger's actions were reckless. He had reason to know facts which would lead a reasonable logger to realize that by cutting these trees and not using good logging practices to make sure they fell only on Hagan's property that the trees would fall on Johnson's property and create an unreasonable risk of physical harm to the Johnson's property. This risk was substantially greater than that necessary for negligence because he had been warned by Johnson that there was a dispute over where the property line was and that good logging practices required him therefore to halt logging until he had firmly established the property line. Merely cutting the trees and letting them fall on Johnson's property would be negligence. After being warned about the property line and continuing to let trees fall on Johnson's property was more than negligence, it was reckless.
Accordingly, Hershberger's fourth assignment of error is without merit.
Hershberger alleges in his fifth assignment of error that:
 "THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING RESTORATION DAMAGES FOR TWO (2) TREES THAT FELL ONTO THE ADJACENT PROPERTY."
The trial court awarded Johnson the replacement/restoration costs of the damaged trees calculated at $31,100, that amount to be trebled.
Hershberger's arguments under this assignment of error can be delineated along the lines of two separate and distinct issues. The first is whether restoration costs was an appropriate measure of damages. The second is whether the trial court used the proper method to calculate those restoration costs.
As a general rule, in an action for the cutting, destroying, and/or damaging of trees and other growth, and for related damage to the land, the measure of damages is the diminution in value of the land (i.e., the difference in the fair market value of the land before and after the damage). See Denoyer v. Lamb (1984),22 Ohio App.3d 136, paragraph one of the syllabus; Kapcsos v. Hammond
(1983), 13 Ohio App.3d 140, paragraph one of the syllabus;Thatcher v. Lane Const. Co. (1970), 21 Ohio App.3d 41 [21 Ohio App.2d 41], 43. However, where this measure of damages has fallen short of fully compensating the injured party, courts have turned to alternative methods. See Lindsay v. Herren (Mar. 21, 1990), Mahoning App. No. 89 C.A. 75, unreported, 1990 WL 34737; Denoyer, supra; Thatcher, supra.
Some courts have allowed replacement or restoration costs of the trees damaged or destroyed. Kapcsos allows for such recovery, but only if there is evidence that the trees were "ornamental".Kapcsos, 13 Ohio App.3d at paragraph one of the syllabus. Ornamental trees are those that have a "calculable value separate from that of the land upon which they stood, rather than those indigenous to the area." Id. Other courts have not been so restrictive. Denoyer allows for such recovery if the injured party "intends to use the property for a residence or for recreation of for both, according to his personal tastes and wishes." Denoyer, 22 Ohio App.3d at paragraph one of the syllabus. However, Denoyer places a reasonable limit on the amount of damages that may be recovered. The injured party may recover "the costs of reasonable restoration of his property to its preexisting condition or to a condition as close as reasonably feasible, without requiring grossly disproportionate expenditures and with allowance for the natural process of regeneration within a reasonable period of time." Id.
In Lindsay, supra, this court acknowledged the general rule but also recognized that a court may need to deviate from it in order to fully compensate the injured party. Lindsay, 1990 WL 34737 at *1. The Lindsay court also endorsed the restrictive exception found in Kapcsos as well as the more liberal approach taken by Denoyer.
As for the "ornamental" exception set forth in Kapcsos, the trial court's decision acknowledged that the damaged trees were not ornamental. Therefore, analysis and application of the "ornamental" exception to the general measure of damages found inKapcsos is unnecessary.
Instead, the court's decision seems to rest more upon the approach taken in Denoyer, which allows recovery of the replacement/restoration costs of the damaged trees if the injured party intended to use the property for residential and/or recreational purposes, according to their personal tastes and wishes.
In that vein, Hershberger implicitly argues that residential and/or recreational use was not the intended use of the property. Hershberger also argues that Johnson's damages should have been limited to the stumpage value[4] of the damaged trees ($1,123.29) or the "aesthetic" value of the trees ($1,160), both values set forth in Plaintiff's Exhibit 4, a document prepared by Johnson's expert witness, Dave Coldwell.
The focus in Denoyer is on whether the injured party intended to use the property for residential and/or recreational purposes, according to their personal tastes and wishes. Johnson testified that he purchased the property for his own personal and recreational use, because it had woods on it and he has used the property for those purposes. (Findings of Fact and Conclusions of Law, p. 11). He took the time, trouble and effort to put paths through the property for his own pleasure and that of his family.Id.
Johnson's intended use of the property also precludes a damage award limited only to stumpage value. Stumpage value is "important only to the owner who holds his land in order to exploit its timber. Stumpage is generally a much smaller amount than the cost of replacement or restoration. To limit an owner to stumpage * * * would be to enforce a timber harvest on the owner without consideration of his/her intended use and his/her real loss." Denoyer, 22 Ohio App.3d at 140.
Having determined that residential and recreational use was the intended use of Johnson's property, the next inquiry is whether the replacement/restoration costs awarded by the trial court were reasonable (i.e., replacement/restoration of the damaged trees does not require a "grossly disproportionate expenditure").
The trial court properly calculated the reasonable replacement/restoration cost of the damaged trees. Several large trees were damaged including 2 hickorys, 2 cherrys, a red maple, a red oak, and an ash. (Findings of Fact and Conclusions of Law, p. 5). Also damaged and in danger of dying are 13 elms, 12 ironwood, 3 dogwood, 8 cherry, 3 red maple, 2 ash, 5 red oak, and 1 cucumber magnolia, each with a 5 inch stump. Id.
There was evidence presented that the cost of purchasing and reinstalling all the damaged trees with 5 inch diameter trees from nursery stock would be $182,600. The actual cost of 5 inch trees to replace just the larger trees damaged would be $7,450. The actual cost of 2 inch diameter trees to replace the damaged 5 inch diameter trees could be $10,360. The damaged large trees could be purchased and replaced. However, the purchase price of such trees would be approximately $40,000.
The trial court ended up calculating the replacement costs at $23,650, the cost of 2 inch diameter trees to replace the 5 inch trees, and $7,450, the cost of 5 inch trees to replace the larger trees, for a total of $31,100. This amount represents a fair compromise between the low and high figures presented at trial. Also, the fact that the court decided on the cost of smaller replacement trees reflects that it was allowing for the natural process of regeneration within a reasonable period of time.Denoyer, supra.
In sum, there was competent, credible evidence showing that Johnson intended to use the property for a residence or for recreation of for both, according to his personal tastes and wishes. Therefore, the trial court did not err by awarding Johnson the costs of reasonable restoration of his property to its preexisting condition or to a condition as close as reasonably feasible.
Accordingly, Hershberger's fifth assignment of error is without merit.
The judgment of the trial court is hereby reversed as to Troyer and affirmed as to Hershberger.
VUKOVICH, J., WAITE, J., concurs.
[1] "Clear-cutting" is the "removal of all the trees in a stand of timber." Merriam-Webster's Collegiate Dictionary, Tenth Edition (1998) 213
[2] Slash is "[b]ranches and other residue left on a forest floor after the cutting of timber." The American Heritage Dictionary of the English Language, Third Edition (1992)
[3] A skidder is a "heavy, four-wheel tractor used to haul logs, especially over rugged terrain." The American Heritage Dictionary of the English Language, Third Edition (1992)
[4] "`[S]tumpage' is the value of the undisturbed timber standing or lying on the land; add to that the cost of felling and hauling, to find the value of the logs; add to that, again, all costs of manufacture, to obtain the value of the finished product." (Footnote omitted.) Denoyer, 22 Ohio App.3d at 140.