**STEWART et al., Appellants,**

v.

**URIG, Appellee.**

[Cite as *Stewart v. Urig,* 176 Ohio App.3d 658, 2008-Ohio-3215.]

Court of Appeals of Ohio,
Ninth District, Lorain County.

No. 07CA009287.

Decided June 30, 2008.

William N. Masters, for appellant.

Warren S. George, for appellee.

CARR, Presiding Judge.

{¶ 1} Appellant, Martin Stewart, appeals the judgment of the Lorain County Court of Common Pleas, which granted summary judgment in favor of appellee, Dan Urig. This court reverses.

## I

{¶ 2} On July 21, 2003, Stewart was injured when a garage collapsed and fell on him while he was assisting Urig in the demolition of the garage. On January 12, 2007, Stewart refiled a complaint against Urig, alleging that he suffered injury as a result of Urig's negligence. Urig answered, denying any negligence, and raising the affirmative defense of assumption of the risk.[1]

{¶ 3} On March 30, 2007, Urig filed a motion for summary judgment. Stewart filed a brief in opposition on June 11, 2007. Urig replied on June 29, 2007, and Stewart filed a surreply on July 20, 2007. The same day, Stewart filed a supplemental submission of evidence, attaching Urig's responses to a first request for admissions. On July 23, 2007, Urig filed his supplemental affidavit to clarify, correct, and supplement the record. On October 23, 2007, the trial court granted summary judgment in favor of Urig. Stewart timely appealed, raising one assignment of error for review.

## II

### ASSIGNMENT OF ERROR

The trial court erred in granting summary judgment on behalf of defendant-appellee, when by doing so, it determined issues of witness credibility and weighed the conflicting evidence of record.

{¶ 4} Stewart argues that the trial court erred by granting summary judgment in favor of Urig because, when doing so, it determined issues of witness credibility and weighed the conflicting evidence. This court agrees.

---

1. Urig raised other affirmative defenses, although no other defenses are relevant to this appeal.

{¶ 5} This court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. This court applies the same standard as the trial court, viewing the facts in the case in the light most favorable to the nonmoving party and resolving any doubt in favor of the nonmoving party. *Viock v. Stowe–Woodward Co.* (1983), 13 Ohio App.3d 7, 12, 13 OBR 8, 467 N.E.2d 1378.

{¶ 6} Pursuant to Civ.R. 56(C), summary judgment is proper if:

(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267.

{¶ 7} To prevail on a motion for summary judgment, the party moving for summary judgment must be able to point to evidentiary materials that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. Once a moving party satisfies its burden of supporting its motion for summary judgment with sufficient and acceptable evidence pursuant to Civ.R. 56(C), Civ.R. 56(E) provides that the nonmoving party may not rest upon the mere allegations or denials of the moving party's pleadings. Rather, the nonmoving party has a reciprocal burden of responding by setting forth specific facts, demonstrating that a genuine triable issue exists to be litigated for trial. *State ex rel. Zimmerman v. Tompkins* (1996), 75 Ohio St.3d 447, 449, 663 N.E.2d 639.

{¶ 8} The uncontested facts are as follows. Stewart worked for Tyler Cotton's company, Blast–Abrade. Cotton ran his business out of his home. Cotton contracted with Urig for the demolition of a garage on his property. He told Urig that two Blast–Abrade employees, Stewart and Brian Bristo, would assist Urig in the demolition.

{¶ 9} On July 21, 2003, the three men began deconstructing the garage by removing doors, windows and siding. Urig climbed on the roof and made multiple cuts with a saw from the peak of the roof to the eaves, effectively sectioning the roof into four to five foot widths. During the course of the demolition, and while Urig was bringing debris to a burn pile or returning therefrom, the garage collapsed and Stewart was injured. Other factual issues are in dispute.

{¶ 10} This court has stated:

In ruling on a motion for summary judgment the trial court is not permitted to weigh the evidence or choose among reasonable inferences. *Dupler v. Mansfield Journal Co.* (1980), 64 Ohio St.2d 116, 121 [18 O.O.3d 354, 413 N.E.2d 1187]. Rather, the court must evaluate the evidence, taking all permissible inferences and resolving questions of credibility in favor of the non-moving party. Id.

*Harry London Candies, Inc. v. Bernie J. Kosar Greeting Card Co.* (Feb. 6, 2002), 9th Dist. No. 20655, 2002 WL 185305.

{¶ 11} In this case, the trial court granted summary judgment in favor of Urig based upon the following findings:

(1) Plaintiff acted without instruction from Defendant in pushing down the garage; (2) Plaintiff knew that the garage would collapse and had planned an escape route if the garage started to collapse; (3) Plaintiff denied that Defendant did anything reckless or careless in his deposition; (4) that demolition is in and of itself a dangerous activity; and (5) Defendant testified that he told Plaintiff to wait until he returned so that they could push the garage down with a Bobcat.

Oct. 23, 2007 journal entry, Lorain County Court of Common Pleas case no. 07CV149192. However, the "evidence adduced both for and against the motion[ ] for summary judgment presented the trial court with two competing reasonable inferences." *Harry London Candies, Inc.,* supra.

{¶ 12} Urig testified at his deposition that he told Stewart and Bristo not to attempt to push over the garage themselves. Urig testified that he told them that he would use his Bobcat to knock down the garage in one piece after he returned from hauling debris to the burn pile.

{¶ 13} Stewart, however, testified at his deposition that Urig was directing the demolition of the garage and told him and Bristo that they would be laying the garage down "like a piece of bread in sections." Stewart testified that Urig was unable to cut through the soffits, or underportions, in the roof with his saw and that Urig directed him or Bristo to finish making those cuts from inside the structure. Stewart testified that he happened to be the one who picked up a "sawzall" to make those cuts. He testified that he made the necessary cuts in one section and that he and Bristo pushed down that section to the west. He testified that Urig saw that they had pushed down a section as he returned from a trip to the burn pile.

{¶ 14} Stewart testified that Urig never told him not to push down the individual sections. In fact, Stewart testified that Urig's demolition plan was that they knock the garage down section by section with the roof attached to each section because Urig did not want to remove the roof and have to clean up

shingles. By making the subsequent soffit cuts, Stewart testified that he was merely doing what Urig requested to "take it down in sections." In regard to the method of demolition, Stewart testified:

> I would cut out, like Dan said, three or four 2 by 4's at the top and bottom, and then run the saw down the side of the rafters or the studs that we were leaving there, and that wall would get pushed out, and then Dan would take his Bobcat and take it to the burn pile.

{¶ 15} It is clear that the trial court either improperly disregarded Stewart's deposition testimony or weighed the evidence to find Urig's testimony regarding the demolition plan more credible. Accordingly, the trial court erred by granting summary judgment in favor of Urig on its findings that Stewart acted without instruction from Urig in pushing down the garage and that Stewart was instructed to wait for Urig to push down the garage with his Bobcat.

{¶ 16} The trial court granted summary judgment in favor of Urig based upon other improper factual findings, as well.

{¶ 17} Early during the day of demolition, the local fire department visited the property after a call reporting a fire. Urig testified that he believed that he had not yet made the cuts in the roof of the garage when he, Cotton, Stewart, Bristo and fire department personnel stood inside the garage to discuss the burn pile. Stewart testified that on the contrary, the fire department did not arrive until after Urig made those structural cuts, and everyone stood under the cut roof to discuss the burn pile. Stewart further testified that Urig instructed him and Bristo to saw through the soffits from inside the garage after he had made the initial cuts in the roof.

{¶ 18} Although Stewart testified that he recognized that the garage would not be so structurally sound after they removed sections of the support structure of the building, he also testified that he felt secure in the garage because he believed that Urig knew what he was doing. Stewart testified that he was not an expert in demolition. He testified that Urig never told him or Bristo to "stay away" from the structure after Urig made the cuts in the roof. He acknowledged that common sense dictated that the structure would be weaker after those cuts, but that it was Urig's plan to do that to allow for the demolition of the building in sections.

{¶ 19} Stewart testified that he had cut through a soffit inside the garage in preparation for pushing over the second section, when he heard a "cracking sound." He testified that he began running east from the center of the garage to exit before the structure collapsed. He testified that his escape was blocked on all other fronts. Stewart explained that he was not pushing on the structure when it began to collapse, and he believed that Bristo was not pushing either.

There is no evidence to support the trial court's finding that Stewart "knew that the garage would collapse." On the contrary, Stewart testified that Urig's plan was for them to push the sections down individually after the appropriate soffit cuts.

{¶ 20} Although Stewart agreed that Urig did not do anything "reckless or careless or crazy" during the job, he also testified as follows:

I believe as a contractor that to my knowledge has done this type of work, he should have either directed us not to do it the way he directed us to do it, or he was negligent in the part of his not giving us other alternatives to do it. But I don't believe he did his job as a professional, no.

Accordingly, the trial court's finding that Stewart denied in his deposition that Urig did anything reckless or careless was contextually inaccurate.

{¶ 21} Urig testified that he had demolished approximately two garages on previous occasions. He testified that no one had taught him how to do it; rather, he was "probably self-taught." He denied having ever read anything about the process of demolishing a garage. Instead, he testified, "I based my experience on how the garage went up. So I reversed the process."

{¶ 22} Stewart produced the affidavit of Geoff Russell, a project manager for Precision Environmental Co., one of the largest demolition companies in the United States. Russell averred that he has been professionally involved in 250 to 300 demolition projects in his 13 years with the company. He averred that he reviewed the method by which Cotton's garage was dismantled and opined that Urig's method of demolition destabilized the structure in a reckless and negligent manner. He averred that it was negligent and very dangerous to have allowed anyone to stand under the structure after Urig made the cuts in the roof. Russell averred in conclusion that the garage collapsed on Stewart during the course of the demolition project as a direct and proximate result of the recklessness and negligence of Urig. Again, based on its review of the record, the trial court improperly concluded that no material issue of fact existed in regard to Urig's negligence.

{¶ 23} Finally, the trial court improperly granted summary judgment in favor of Urig in part on its finding that "demolition is in and of itself a dangerous activity." By this finding, the trial court effectively found that Urig prevailed on his defense of assumption of the risk.

{¶ 24} In 1983, the Ohio Supreme Court recognized the merger of the defense of implied assumption of risk with contributory negligence under the provisions of R.C. 2315.19 then in effect. *Anderson v. Ceccardi* (1983), 6 Ohio St.3d 110, 113, 6 OBR 170, 451 N.E.2d 780. That version of R.C. 2315.19 was repealed on April 9, 2003, although current R.C. 2315.33 similarly provides that

contributory fault of a person does not bar the person * * * from recovering damages that have directly and proximately resulted from the tortious conduct of one or more other persons, if the contributory fault of the plaintiff was not greater than the combined tortious conduct of all other persons from whom the plaintiff seeks recovery * * *.

R.C. 2307.011 defines "contributory fault" as used in R.C. Chapter 2315 as "contributory negligence, other contributory tortious conduct, or, except as provided with respect to product liability claims * * *, express or implied assumption of the risk."

{¶ 25} The Ohio Supreme Court distinguished between the defenses of primary assumption of risk and implied assumption of the risk in *Gallagher v. Cleveland Browns Football Co.* (1996), 74 Ohio St.3d 427, 659 N.E.2d 1232. "[P]rimary assumption of risk, when applicable, prevents a plaintiff from establishing the duty element of a negligence case." Id. at 433, 659 N.E.2d 1232. Moreover, "a defendant who asserts this defense asserts that no duty whatsoever is owed to the plaintiff." Id. at 431, 659 N.E.2d 1232. "Whether or not a duty exists is a question of law." *Brockman v. Terminal Warehouse, Inc.*, 9th Dist. No. 23258, 2007-Ohio-248, 2007 WL 162916, at ¶ 9, citing *Williams v. Garcias* (Feb. 7, 2001), 9th Dist. No. 20053, 2001 WL 111580.

{¶ 26} In reliance on its prior holding in *Cincinnati Baseball Club Co. v. Eno* (1925), 112 Ohio St. 175, 147 N.E. 86, the *Gallagher* court stated that

> only those risks directly associated with the activity in question are within the scope of primary assumption of risk, so that no jury question would arise when an injury resulting from such a direct risk is at issue, meaning that no duty was owed by the defendant to protect the plaintiff from that specific risk. In many situations, as in Eno, there will be attendant circumstances that raise questions of fact whether an injured party assumed the risk in a particular situation. In that case, the doctrine of implied assumption of risk, not primary assumption of risk, would be applicable.

*Gallagher*, 74 Ohio St.3d at 432, 659 N.E.2d 1232. In addition, "[g]enerally, courts have held that whether work is inherently dangerous is a question of law for the court, rather than a jury, to decide. This is so because whether the work is inherently dangerous goes to whether a duty is owed, which is a question of law." (Citations omitted.) *Salanki v. Doug Freshwater Contracting, Inc.*, 7th Dist. No. 06–JE–39, 2007-Ohio-6703, 2007 WL 4374440, at ¶ 45.

{¶ 27} The Eighth District Court of Appeals addressed the issue of whether the demolition of a single-story garage was an inherently dangerous activity. *Rodic v. Koba* (Dec. 7, 2000), 8th Dist. No. 77599, 2000 WL 1807042. The *Rodic* court defined "inherently dangerous" work as "work which, although not highly

dangerous, involves a risk recognizable in advance that danger inherent in the work itself, or in the ordinary or prescribed way of doing it, may cause harm to others." *Rodic,* quoting *Bohme, Inc. v. Sprint Internatl. Communications Corp.* (1996), 115 Ohio App.3d 723, 736, 686 N.E.2d 300, quoting Restatement of the Law 2d, Torts (1965), Section 427, comment c. The *Rodic* court distinguished the Ohio Supreme Court's holding in *Covington & Cincinnati Bridge Co. v. Steinbrock & Patrick* (1899), 61 Ohio St. 215, 55 N.E. 618, in which the high court found the demolition of a five-story warehouse that had been partially destroyed by fire and abutted an alleyway to be inherently dangerous work and held that the demolition of a mere one-story garage, away from a public thoroughfare, is not an inherently dangerous activity.

{¶ 28} As in *Rodic,* the parties in this case were engaged in the demolition of a one-story garage that did not abut a public thoroughfare. Geoff Russell, who had been involved in 250 to 300 demolition projects, averred in his affidavit that there is a safe and proper method by which to deconstruct a building, including proper shoring and bracing of the structure. Although one might reasonably expect a building that is being demolished to collapse, it does not necessarily follow that the building must fall in on itself. Stewart testified at his deposition, in fact, that Urig's plan was for the building to fall in sections, one upon another. For these reasons, this court agrees with the Eighth District Court of Appeals that the demolition of a one-story garage that does not abut a public thoroughfare is not an inherently dangerous activity. Accordingly, Stewart's participation in the demolition did not negate Urig's duty of care owed to the workers he was directing.

{¶ 29} Furthermore, a genuine issue of material fact exists regarding Stewart's implied assumption of the risk, or comparative fault, in this case. Urig testified that Stewart ran into the garage as it collapsed, while Stewart testified that the garage began to collapse as he was walking from the center of the garage to the outside. Stewart testified that he was in the garage at Urig's direction, and he was running out of the collapsing garage when the roof fell on a portion of his body. In addition, Stewart testified that no one was pushing on the structure when it began to collapse.

{¶ 30} In this case, the trial court improperly disregarded some Civ.R. 56 evidence, assessed the credibility of witness testimony, and weighed other conflicting evidence to grant summary judgment in favor of Urig. For the reasons discussed above, genuine issues of material fact exist regarding Stewart's claim of negligence, so that the trial court erred by granting summary judgment in favor of Urig. Stewart's assignment of error is sustained.

## III

{¶ 31} Stewart's sole assignment of error is sustained. The judgment of the Lorain County Court of Common Pleas is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

MOORE and DICKINSON, JJ., concur.